Audrey M. CHERNOFF, Individually, and as Independent Executrix of Estate of William J. Chernoff, Deceased, Appellant,

v.

CHERNOFF BROTHERS, INC. et al., Appellees.

No. 6127.

Court of Civil Appeals of Texas, Waco.

March 7, 1980.

Irwin Acker, Houston, for appellant.

Vance Dunnam and Jim Meyer, Dunnam, Dunnam, Horner & Meyer, Waco, for appellees.

OPINION

JAMES, Justice.

This is a suit based upon transactions growing out of corporate stockholders' "buy and sell" agreements. At the conclusion of the evidence the trial court instructed a verdict in favor of the Defendant-Appellees. We affirm.

Plaintiff-Appellant Audrey M. Chernoff, Individually and as Independent Executrix of the Estate of her deceased husband, William J. Chernoff, brought this suit against Defendant-Appellees Chernoff Brothers, Inc., and Hub Optical Distributors, Inc., seeking to recover a balance of $88,000.00 which she alleges is due her in payment for one-third of the stock which she and her deceased husband owned in each of the two

Defendant corporations, plus a bonus which she asserts is due her. More specifically, Plaintiff-Appellant's suit is based upon a written stock purchase and sale agreement labelled, "Plaintiff's Exhibit No. 6", hereinafter referred to as "PX6." PX6 is a written contract which in its pertinent parts recites: "Date of Execution: October 12, 1976 (Revised January 18, 1977)"; is executed by Saul B. Chernoff, Samuel J. Chernoff, and William J. Chernoff (the deceased), all individually, plus Chernoff Brothers, Inc., by William J. Chernoff, President, and Hub Optical Distributors, Inc., by William J. Chernoff, President. PX6 further recites that the three Chernoff brothers (Saul, Sam, and William J.) are the sole stockholders in both of the abovenamed corporations, each owning one-third of the stock in each such corporation, that is to say, that each brother owns 100 shares of stock in each corporation; that upon the death of a stockholder, the corporations agree to purchase the stock of the deceased stockholder, and the legal representative of the deceased stockholder agrees to sell such stock respectively to each corporation. Said contract goes on to recite that the stock owned by each of the three brothers is worth $138,000.00; that upon the death of a stockholder the corporations (jointly) will pay the deceased stockholder's legal representative $50,000.00 cash, with the balance of $88,000.00 to be paid by the corporation in the form of a note, bearing no interest, payable in equal quarterly installments of $7333.33 each; that upon receipt of the purchase price by way of said cash and note, said legal representative shall execute and deliver to the corporations such instruments as are necessary and proper to transfer full title of the deceased's shares of stock to said corporations, and at the same such time the corporations shall assign to such legal representative as collateral security for the payment of the unpaid note of the corporations, such number of shares of stock as shall equal in value the amount of the unpaid note.

To the contrary, the Defendants contend that PX6 was not the contract in effect at the time of William J. Chernoff's death, but rather another contract labelled "Defendants' Exhibit 2" (hereinafter called "DX2") was the effective contract at such death. "DX2" is another stock purchase and sale agreement executed by the same parties as those who signed PX6, reciting: "Date of Execution: October 12, 1976"; and in its pertinent parts reciting that the three Chernoff brothers each own 100 shares of stock in each of the two corporations; that the value of each brother's stock (in both corporations) is $50,000.00, with similar provisions as those of PX6 concerning a binding "buy and sell" agreement upon the death of one of the brothers. Upon death of a stockholder, his legal representative would be paid $50,000.00 cash for such deceased brother's stock, payable by life insurance proceeds.

In addition to the above two contracts, the three brothers acting for the corporation of Chernoff Brothers, Inc., executed effective April 1, 1976, a third written agreement called a "Salary Continuation Agreement," which in effect provided that Dr. William J. Chernoff's named beneficiary would be paid a salary for his (Dr. William J. Chernoff's) services as president of such corporation in the amount of and at the rate of $700.00 per month from the date of his death until April 1, 1986. This contract provided that this benefit was being paid in consideration of the "capable and efficient manner" in which Dr. William J. Chernoff was performing his duties as president.

Dr. William J. Chernoff died February 8, 1978, and thereafter his widow, Audrey M. Chernoff, was made independent executrix of his estate; and in addition thereto, she was named beneficiary of her husband in all things material to this lawsuit.

After Dr. William J. Chernoff's death, the two corporations acting by and through the surviving two brothers, Saul and Sam, acted under contract DX2 and the "Salary Continuation Agreement," and thereby paid Audrey M. Chernoff $50,000.00 in payment of all of William's stock in both corporations, and additionally paid her a sum of money at the rate of $700.00 per month

from April 1, 1976, until William's death, February 8, 1978, or some $14,875.00, and in addition thereto Defendant-Appellee Corporations commenced paying Audrey $700.00 per month each month after William's death. According to the record, Audrey was continuing to receive such payments.

Audrey of course claims she is entitled to the $50,000.00 payment and the payments made pursuant to the salary continuation agreement; however, she contends that contract DX2 does not apply, but instead contract PX6 applies, to the end that she further has coming to her $88,000.00 balance under PX6 in payment for her deceased husband's stock. Moreover, about a month after William's death, the two corporations paid Sam and Saul each a bonus in the amount of about $14,000.00, which she asserts was in payment for services rendered for the year immediately preceding the payment of such bonus; and since William was alive about eleven months of such year, that his estate is entitled to approximately 11/12ths of such a bonus.

The following is a factual summary which shows background facts throwing light on the written agreements in evidence, all of which facts are virtually undisputed: Sam, Saul, and William desired to make provisions so that their respective families might be protected in event of death of one of them; and that in such eventuality each party concerned would be treated fairly and equally. To accomplish this they contacted Ted Frank, a chartered life underwriter from Dallas, to help them work out a plan. Sam and Saul were each insurable for life insurance; however, William had heart trouble and could not obtain life insurance except in a group composed of himself and his two brothers, Saul and Sam. In other words, they learned that the three together as a group could get as much as $50,000.00 life insurance each. Then in order to afford additional protection, the brothers set up a pension fund whereby in event of death of one of them, such deceased's estate would receive about $88,-000.00. Saul and Sam each funded their respective portions of the pension fund by paying in life insurance premiums, so that

if either Saul or Sam died, that deceased's estate would be paid off by life insurance proceeds in the amount of approximately $88,000.00. But here again William could not get life insurance for this purpose. For William the corporations had to make cash deposits into the pension fund, so that if William died before April, 1986, his estate would receive an amount equal to $700.00 per month from April 1, 1976, to the date of his death, and his beneficiary would receive $700.00 per month from William's death until April 1, 1986. They needed the salary continuation agreement, so that in the event of William's death, his estate would receive a total of some $84,000.00 (or $700.00 per month for 10 years). That is to say, the salary continuation agreement is the vehicle they needed to give William's estate the substantially same benefits as that of Sam or Saul, no matter when William died any time between April 1, 1976, and April 1, 1986.

After the Chernoff brothers had firmed up the mechanics of how to implement this program, Ted Frank told them they would need to employ an attorney to draw up the necessary instruments. Thereupon, the Chernoff brothers employed a lawyer who drew up the contract which we call PX6, the one which sets the value of each of the brother's stock at $138,000.00. The three brothers and the two corporations on or about January 18, 1977, executed PX6. The $138,000.00 figure of course was composed of the $50,000.00 covered by life insurance plus the $88,000.00 benefits to be paid from the pension fund. When Ted Frank learned of this contract, he contacted the brothers and their lawyer and told them this contract was unworkable, because by combining the sale of the stock in the same contract as the pension benefits, there would be tax complications. In other words, with contract PX6, the estate of each of the three brothers would be greatly increased, thereby greatly increasing Federal Estate tax liability in event of death of one of the brothers. Frank told them that the stock purchase and sale contract would have to be kept entirely separate and apart from the

pension fund benefits, and that neither should make any reference to the other. At this point, the brothers' lawyer requested Mr. Frank to draw up the papers, and thereupon, Mr. Frank drew up contract DX2 and the "Salary Continuation Agreement." Contract DX2 and the "Salary Continuation Agreement" were both signed on or about March 8, 1977, *after* contract PX6 had been signed.

■ The confusion was largely brought about because PX6 bore a date *after* DX2, whereas actually PX6 was in truth and in fact signed *before* DX2. We have reviewed the three written contracts and the background facts surrounding their execution to show that at the time William died on February 8, 1978, contract DX2 and the salary continuation agreement were the contracts in effect, and PX6 relied upon by Plaintiff-Appellant had been superseded. Under DX2 and the salary continuation agreement, Plaintiff-Appellant was entitled to $50,000.00 cash for her stock, plus a cash payment for back salary at the rate of $700.00 per month from April 1, 1976, to February 8, 1978, (the date of William's death), plus $700.00 per month from William's death until April 1, 1986. This was the basis upon which Defendant-Appellees had paid and were paying Plaintiff-Appellant, Mrs. Audrey M. Chernoff.

At the conclusion of the evidence, the Defendant-Appellees moved for an instructed verdict in their favor. The trial court overruled this motion, advising that it would permit Plaintiff an opportunity to request the submission of special issues to the jury.

Thereupon Plaintiff requested six special issues, all of which are merely evidentiary, and if all were answered favorably to Plaintiff, they would form no basis for a judgment in Plaintiff's favor. Moreover, each one of these requested special issues raise matters which are undisputed. After these six special issues had been requested by Plaintiff, the trial court refused same and then granted the Defendants' motion for instructed verdict to the effect that Plaintiff take nothing, and entered judgment in accordance therewith. Plaintiff appeals from this judgment.

■ In this state of the record, the instructed verdict was proper. Plaintiff-Appellant had the burden of drafting controlling special issues in substantially correct form and requesting the trial court to submit them to the jury, which issues if answered in Plaintiff-Appellant's favor would form the basis of a judgment in Plaintiff-Appellant's favor. Having failed to do this, Plaintiff-Appellant has waived any ground of recovery. Rule 279, Texas Rules of Civil Procedure; *Ormsby v. Ratcliffe* (1928) 117 Tex. 242, 1 S.W.2d 1084; *Phelan v. Settle* (Amarillo Tex.Civ.App.1969) 438 S.W.2d 377, N.R.E.; *Holloman v. City of Georgetown* (Austin Tex.Civ.Ap.1975) 526 S.W.2d 682, N.R.E.; *Kinnear v. Dixon* (Beaumont Tex.Civ.App.1976) 543 S.W.2d 903, N.R.E.; *Dittberner v. Bell* (Amarillo Tex.Civ.App. 1977) 558 S.W.2d 527, N.R.E.; also see *Wright v. McKinzie* (San Antonio Tex.Civ. App.1957) 302 S.W.2d 231, no writ; *Bridwell v. City of Center* (Tyler Tex.Civ.App. 1977) 546 S.W.2d 388, no writ.

Rule 279 in its pertinent parts provides:

"Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived; . . . ."

In the case at bar, Plaintiff-Appellant, by failing to request the submission to the jury of controlling special issues which if answered favorably to her would form the basis of a judgment in her favor upon one or more grounds of recovery, has thereby waived her right to any such ground or grounds of recovery. In this state of the record, the trial court properly instructed a verdict in favor of Defendant-Appellees.

■ Appellant also asserts error of the trial court in sustaining Defendants' objections to expert testimony proffered by Plaintiff. We have carefully examined the excluded evidence and have concluded that there was no error on the part of the trial court in excluding such evidence. However, be that as it may, even if such consti-

tuted error, it was harmless since it could not possibly have caused the rendition of an improper judgment in this case. Rule 434, Texas Rules of Civil Procedure; *Gomez Leon v. State* (Tex.1968) 426 S.W.2d 562; also see *Ryder Tank Lines Inc. v. Bentley* (Fort Worth Tex.Civ.App.1965) 397 S.W.2d 914, N.R.E.; *Purvis v. Johnson* (San Antonio Tex.Civ.App.1968) 430 S.W.2d 226, no writ.

All of Appellant's points and contentions have been carefully considered, and have been overruled as being without merit. The trial court's judgment is accordingly affirmed.

AFFIRMED.